```
             UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF OHIO
                   WESTERN DIVISION
```

WENDELL BEDFORD,               :   Case No. 1:01-cv-861
                               :
    Plaintiff,                 :   Judge Beckwith
                               :
vs.                            :
                               :
CINERGY CORPORATION d/b/a      :
CINCINNATI GAS & ELECTRIC      :
COMPANY,                       :
                               :
    Defendant                  :

ORDER

This matter is before the Court on Plaintiff's Objections to the Magistrate Judge's Report and Recommendations (Doc. 57), and the Defendant's Response to those Objections (Doc. 58).

BACKGROUND

This case arises from Cinergy's[1] termination of Plaintiff's employment on August 7, 2000, following a random drug test. Plaintiff was first employed by Cinergy in February 1990 in the Gas Operations Department as a Mechanic III. Plaintiff was a member of the United Steel Workers Association throughout his employment at Cinergy. Plaintiff asserts (and Cinergy does not dispute) that, prior to the events giving rise to this lawsuit, Plaintiff had a good employment record and received several promotions.

---

[1] Defendant's correct name is The Cincinnati Gas & Electric Company, for ease of reference referred to as "Cinergy."

-1-

Many Cinergy employees, including those in the Gas Operations Department, are subject to random drug tests required by federal law.  Workplace drug and alcohol testing is strictly regulated by DOT regulations, which Cinergy supplements with its own policies and procedures.  Cinergy contracted with Bethesda Care Norwood to conduct the actual sampling and laboratory testing for the required random tests.  Cinergy also contracted with Alliance Laboratory Specialists to develop a computer generated system that randomly selected employees for monthly drug and alcohol testing. (Burck Affidavit ¶8, Doc. 36, Attachment B)

Temperature measurement of urine samples is a critical part of the testing regimen.  The federal regulations state: "Immediately after the specimen is collected, the collection site person shall measure the temperature of the specimen.  The temperature measuring device used must accurately reflect the temperature of the specimen and not contaminate the specimen.  The time from urination to temperature measure is critical and in no case shall exceed 4 minutes." 49 C.F.R. §40.25(f)(12).[2]  The regulations also state: "A specimen temperature outside the range of 90° - 100° F. constitutes a reason to believe that the individual has altered or substituted the specimen (see paragraph (e)(2)(i) of this section).  In such cases, the individual

---

[2] The DOT regulations governing drug and alcohol testing were substantially revised and renumbered after the events giving rise to this lawsuit.  All C.F.R. references are to the regulations that were in effect when Plaintiff's drug test was performed in July 2000.

supplying the specimen may volunteer to have his or her oral temperature taken to provide evidence to counter the reason to believe the individual may have altered or substituted the specimen." 49 C.F.R. §40.25 (f)(13).  Cinergy requires Bethesda to use a temperature strip attached to the specimen bottle that instantly checks the sample temperature, well within the four minutes mandated by the regulation. (Burck Affidavit, ¶6 and document CG&E000207; Doc. 36, Attachment B)

On July 26, 2000, Plaintiff was ordered by his supervisor to report for a random drug test.  Although Plaintiff had worked at Cinergy for over ten years, this was his first random test. (Bedford Depo., p. 122)  Plaintiff reported to the testing facility (Bethesda Queensgate) and gave a urine sample.  The federal regulations state that a random sample can be given "in privacy" absent grounds for reasonable suspicion that the employee will attempt to adulterate or substitute the specimen. Plaintiff produced his sample in privacy and gave it to the Bethesda collector, Ms. Woolley.  Woolley read the strip attached to Plaintiff's specimen bottle, which measured the temperature at 89.4°F.  Woolley rechecked the sample with a digital thermometer, which also registered 89.4°F.  Plaintiff's body temperature was then taken by Woolley, using the same digital thermometer.  The body temperature reading was 98.1°F.  (Woolley Affidavit ¶6-7; Doc. 36, Attachment F)

Plaintiff was then asked to stay at the testing facility in order to provide a second sample.  The federal regulations state

that if the first sample's temperature is not within the 90°-100° F. range, the employee must give a second specimen, which shall be obtained "as soon as possible under the direct observation of a same gender collection site person."  49 C.F.R. §40.25(f)(16).  Plaintiff stayed at the facility and was able to give a second sample at 11:50 a.m., under direct observation of a male Bethesda employee.  (Woolley Affidavit ¶8; Doc. 36, Attachment F) Plaintiff signed both sample collection forms, certifying that he gave his specimen and did not adulterate it in any manner.  (Bell Affidavit, Exhibits E and H; Doc. 36, Attachment E)

Both of Plaintiff's samples were then sent for testing.  The first sample was "rejected for analysis" on July 31 because (the lab noted) the specimen was "below temperature." (Woolley Affidavit, Exhibit H; Doc. 36, Attachment F)  The reasons for the lab's rejection of the sample are not clear from the record.  Both the federal regulations and Cinergy's test protocol state that **all** suspect specimens **shall** be forwarded to the lab for testing.  See 49 C.F.R. §40.25(f)(15); Burck Affidvit ¶6 and Cinergy document CG&E000209; Doc. 36, Attachment B.  The second sample - given in the presence of the Bethesda employee -  tested positive for cocaine metabolites, in a test run on July 31 at 23:30 (Bell Affidavit, Exhibit K; Doc. 36, Attachment E).  The lab notified Kenny Burck at Cinergy about both sample results, and Burck requested Bethesda to obtain a test on Plaintiff's first sample.  (Rufo Affidavit ¶6; Doc. 36, Attachment E)  That test, conducted on August 4, 2000 at 8:19, was negative.  (Bell

-4-

Affidavit, Exhibit J; Doc. 36, Attachment E)

On August 7, Plaintiff met with Cinergy representatives Burck, Fritsch, Rogers and Williams for a fact finding meeting. Plaintiff was asked if he could explain the conflicting test results on his two specimens given within two hours of each other. Plaintiff suggested that the first specimen had been left out in the air conditioned collection room as a reason for its lower-than-normal temperature. (Fritsch Affidavit, Exhibit C; Doc. 36, Attachment D) Plaintiff was offered the opportunity to have the second sample tested again by a different laboratory, as is his right under both the federal regulations and the Cinergy policy. Plaintiff apparently did not exercise his right to do so. The second sample was in fact tested again on October 30, 2000 by Alliance Labs, the same lab that performed the July 31 test, which confirmed the presence of cocaine metabolites. (Bell Affidavit, Exhibit I; Doc. 36, Attachment E)

Cinergy rejected Plaintiff's explanation for the low temperature of the first sample. As no adulterating agent was detected, Cinergy concluded that Plaintiff substituted the first sample (using either his own or someone else's urine). Cinergy found this to be conduct that "clearly obstructs the testing process" in violation of Cinergy's policy. A 1998 company memorandum to "All Employees" states that such conduct would subject the employee to immediate discharge. Plaintiff's employment was terminated effective August 7, 2000. (Fritsch Affidavit, Exhibit C; Doc. 36, Attachment D) Plaintiff

unsuccessfully challenged his termination through his union grievance procedure.

Plaintiff then filed a charge with the Ohio Civil Rights Commission, contending that he had been terminated in violation of federal and state anti-discrimination laws. (Bedford Depo. Exhibit 28)  The OCRC rejected his complaint, finding that the evidence did not substantiate his charge.  (Bedford Depo. Exhibit 29)  Plaintiff then asked OCRC to reconsider its conclusion, alleging for the first time that he was "specifically selected for [drug] testing in retaliation for a prior worker's compensation claim and as part of continuing efforts by the Cinergy Corporation to harass and terminate me."[3]  He also claimed that Cinergy's conclusion that he submitted an adulterated sample was capricious and malicious.  (Bedford Depo. Exhibit 30)  The OCRC rejected Plaintiff's request for reconsideration, finding there was no evidence to suggest that Plaintiff was **not** randomly selected for the drug test.  (Bedford Depo. Exhibit 31)

Plaintiff filed his pro se complaint (Doc. 5) in this Court on October 23, 2001, under Title VII of the Civil Rights Act and its Ohio counterpart, R.C. §4112.  Paragraph 5 of his Complaint alleges "That on or about August 7, 2000, defendant unlawfully terminated Plaintiff's employment for alleged urine test irregularity when similarly situated white employees were subject

---

[3] His original OCRC complaint alleged he was "randomly selected" for the drug test.

to less than termination for equal or more grave urine test irregularity than that alleged against Plaintiff."

Cinergy filed a motion for summary judgment, primarily arguing that Plaintiff failed to establish a prima facie case (Doc. 36). Plaintiff filed an opposition (Doc. 47), and Cinergy replied (Doc. 49). The Magistrate Judge recommended that Cinergy's motion be granted because Plaintiff did not establish a prima facie case of discrimination. (Doc. 55) He also found that Plaintiff failed to raise an issue of material fact about his retaliation claim. Plaintiff filed timely objections to the Magistrate Judge's report (Doc. 57), to which Cinergy responded (Doc. 58).

## ANALYSIS

Magistrate Judge Perelman[4] recommended that Cinergy's motion for summary judgment be granted. This is a case-dispositive pleading, as the granting of the motion would terminate the litigation. Accordingly, the Court reviews de novo Magistrate Judge Perelman's Report and Recommendation. See Fed. R. Civ. P. 72(b).

    A.   <u>Summary Judgment Standards</u>.

The standards for summary judgment are well established. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

[4] Magistrate Judge Sherman retired in 2003, and this case was reassigned to Magistrate Judge Perelman.

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253 (1968)). The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, Superior Roll Forming Co. v. InterRoyal Corp., 494 U.S. 1091 (1990). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, . . . , or is not significantly probative, . . . , the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted). The Supreme Court has held:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...

Id. at 252. Hence the "'mere possibility'" of a factual dispute will not suffice. Mitchell v. Toledo Hospital, 964 F.2d 577, 582 (6th Cir. 1992), quoting Gregg v. Allen-Bradley Co., 801 F.2d 859, 863 (6th Cir. 1986).

Summary judgment is not appropriate simply because the weight of the evidence favors the moving party. Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464, 472 (1962). The issue of material fact required "to entitle a party to proceed to trial is not required to be resolved conclusively in

favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Cities Serv. Co., supra, 391 U.S. at 288-89.

Although summary judgment must be used with extreme caution since it operates to deny a litigant his day in court, Smith v. Hudson, 600 F.2d 60, 63 (6th Cir. 1979), cert. dismissed, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (citations omitted).

   B.   Plaintiff's Discrimination Claim.

The record does not reveal any **direct** evidence of discrimination against Plaintiff due to his race.  Therefore, the Court must determine whether Plaintiff has established a prima facie case of discrimination, under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); see also, Johnson v. Kroger Company, 319 F.3d 858, 864-65 (6th Cir. 2003).  Ohio law interpreting R.C. §4112.02 parallels federal law under Title VII, and the same prima facie test applies to Plaintiff's Ohio law claim.  Plumbers & Steamfitters Joint Apprenticeship Comm. v.

Ohio Civil Rights Comm., 66 Ohio St.2d 192, 421 N.E.2d 128 (Ohio 1981); Carter v. University of Toledo, 349 F.3d 269, 272 (6th Cir. 2003).  In order to establish a prima facie case under McDonnell Douglas, Plaintiff must demonstrate (1) his membership in a protected class; (2) that he was terminated from his employment; (3) that he was qualified for his job; and (4) that he was treated differently than similarly situated employees outside the protected class.

The first three of these factors are not contested here.  In regard to the fourth, Plaintiff must show that "similarly situated" non-protected employees were treated differently than he was.  This requires **relevant** similarity.  The non-protected employees must ". . . have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir. 1992) (citations omitted).  The Court should make an independent determination about the relevancy of a particular aspect of Plaintiff's employment or treatment.  Plaintiff need not demonstrate an "exact correlation," but the non-protected employees must be similar in the **relevant** aspects.  Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).[5]

---

[5] Plaintiff's argument that Magistrate Judge Sherman previously determined that Plaintiff was "similarly situated" with non-protected employees is incorrect.  The Magistrate Judge ruled that Plaintiff could obtain discovery of other employee

Plaintiff contends that two Caucasian employees were not terminated after "substantially similar" violations of Cinergy's drug testing procedures, thus establishing his prima facie case. Employee #1, a Caucasian female[6], reported for random drug testing on June 6, 2000, but she was unable to provide the minimum quantity of urine required by the regulations.  She was told to wait at the facility until she could provide an adequate sample.  She left the building and waited in her truck in the parking lot for about half an hour.  When she returned inside, she was told she could not continue with the test because she had left the facility.  This led to a charge of "refusal to submit" to drug testing which, according to a Cinergy memorandum documenting the incident, is "conduct that clearly obstructs the testing process and . . . will be treated as a positive." (Suppl. Burck Affidvit, Exhibit C, p. 4; Doc. 49, Attachment B) During Employee #1's union grievance, however, Cinergy's representative wrote in a letter to the union that a "refusal to submit" to testing warrants discharge under Cinergy's Drug Involvement Policy.  (Suppl. Burck Affidavit, Exhibit C, p. 13) Employee #1 was not terminated, but was suspended for 14 days, and subjected to unannounced testing for five years, the discipline mandated for a first positive test.  (Her overall

---

records, because Plaintiff had established enough "similarity" to justify discovery under Fed R. Civ. P. 26.

[6] Records concerning these two employees were filed under seal with the Supplemental Burck Affidavit, Doc. 49, Attachment B.

discipline was eventually reduced at the last step of the grievance procedure.)  Employee #1 never had a positive test result.

Employee #2, a Caucasian male, tested positive for cannabis in August 1996 and was disciplined for a "first positive" (14-day suspension and five years unannounced testing).  In June 2000, while still in the five-year testing period, Employee #2 again tested positive, this time for codeine.  Cinergy's policy states that a second positive test without legitimate medical explanation "will result in discharge." (Caldwell Affidavit, Exhibit E and Cinergy document CG&E001184; Doc. 36, Attachment C)  Employee #2 admitted he illegally obtained a prescription pain pill containing codeine from a co-worker.  Cinergy did not terminate Employee #2, after he submitted to a substance abuse evaluation, because of his good service record and Cinergy's belief of his "sincerity as to your innocent intentions." (Suppl. Burck Affidavit, Exhibit F, p. 7; Doc. 49, Attachment B) He was instead treated as a first-time violator, suspended for 14 days and subjected to another five-year period of unannounced tests.

The question then becomes whether these two employees were "similarly situated" to Plaintiff.  Cinergy argues, and the Magistrate Judge found, that neither Employee #1 nor Employee #2 were "substantially similar" to Plaintiff, because neither incident involved an allegation of adulteration or substitution of a sample.

Plaintiff argues that all three employees are similarly

-13-

situated because all three involve a violation of "government standards" for drug testing, which should be punished equally. But the applicable "government standards" are not uniform. Specimen temperature measurements are required to detect altered or substituted specimens.  See 40 C.F.R. §40.25(f)(13).  Specimen quantity requirements, in contrast, appear directly related to qualitative testing concerns.  The DOT regulations unequivocally state: "If an individual has not provided the required quantity of urine, the specimen shall be discarded."  40 C.F.R. §40.25(f)(10)(iv)(A)(2).  Regulations governing response to a positive test result are obviously intended to prevent employees who are under the influence of drugs from causing accidents or injuries.  40 C.F.R. §199.9 forbids an employer from "knowingly using" any employee who fails a test or refuses to take a test. A negative test is required in order to return to work, followed by unannounced testing for five years. 40 C.F.R. §199.11(e).  No federal regulation **requires** termination of employment after a second positive test within that five years.

However, the question of whether the three employees are "similarly situated" is not determined solely with respect to the federal regulations, but with respect to Cinergy's own policies and procedures.  A plaintiff's burden in establishing a prima facie case is not meant to be onerous.  See <u>Christian v. Wal-Mart Stores, Inc.</u>, 252 F.3d 862, 870 (6th Cir. 2001).  The Court concludes that the three employees are "similarly situated" for purposes of establishing Plaintiff's prima facie case, because

each one arguably faced termination for their violation of the drug testing policy or protocol.  Exploration of the merits of Cinergy's justifications for its discipline of Plaintiff and the two non-protected employees should be considered in the third stage of the McDonnell-Douglas framework.

Once Plaintiff has established his prima facie case, Cinergy must submit evidence establishing a legitimate, non-discriminatory justification for Plaintiff's termination. Cinergy has met that burden.  Cinergy persuasively argues that an employee's obstruction of federally-mandated drug testing by adulteration or substitution of samples, is conduct that cannot be tolerated.  Termination of an employee who engages in such conduct is clearly a legitimate, non-discriminatory sanction.

Plaintiff must then come forward with sufficient evidence to establish pretext.  To raise a genuine issue of material fact about pretext, Plaintiff must establish either that (1) Cinergy's reason for terminating him has no factual basis, (2) Cinergy was not **actually** motivated by its stated reason, or (3) Cinergy's stated reason was insufficient to motivate Cinergy to terminate his employment. See Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000).  "Plaintiff must allege more than a dispute over the facts upon which his discharge is based.  He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." Braithwaite v. The Timken Co., 258 F.3d 488, 493-94 (6th Cir. 2001), citing Smith v. Chrysler, 155

F.3d 799, 806-07 (6th Cir. 1998).

Plaintiff's arguments fall into the first and second pretext categories. He argues that Cinergy had no factual basis to fire him because Cinergy didn't "prove" that his first sample was adulterated or substituted. He also argues that the "real reason" he was fired was because of his workers compensation claim. (He doesn't suggest that a deliberate attempt to subvert the drug testing process would be an insufficient reason to terminate an employee.)

Concerning the first argument, Plaintiff claims that his first sample was invalid for testing because of its temperature. There is nothing in the federal regulations that appears to support this claim.[7] While it is true that Alliance Lab did not immediately test Plaintiff's first sample, the lab did not say that the sample **could not** be tested because of its lower temperature. Moreover, it is undisputed that the sample **was** tested several days later and was negative for drugs. Plaintiff has not substantively challenged any of the lab results.

Based on the fact of the conflicting sample tests, and the fact that no adulterating substance was found in the first sample, Cinergy concluded that Plaintiff provided a substituted sample. Plaintiff offers no facts to challenge Cinergy's conclusion, just a general denial that he did anything wrong.

---

[7] The regulations in fact require refrigeration of samples after seven days, and long-term frozen storage of positive samples. See 40 C.F.R. §40.29(c) and (h).

In evaluating Plaintiff's pretext argument, the Court must determine whether the employer can establish reasonable reliance on "particularized facts" known to the employer when it made the decision to terminate Plaintiff. See Smith v. Chrysler, supra, 155 F.3d at 807, noting that the employer need not show that it "left no stone unturned" in reaching its decision, but rather that it made a "reasonably informed and considered decision."

Here, the particularized facts known to Cinergy when it made the decision to terminate Plaintiff all reasonably support Cinergy's conclusion that Plaintiff submitted a substituted sample in an attempt to obstruct the drug test. These facts are (1) Plaintiff's first sample was given in privacy; (2) Plaintiff's first sample temperature measured below the federally-established range, giving rise to a reasonable suspicion of adulteration or substitution; (3) Plaintiff's body temperature measured well above the sample temperature, lending further credence to the possibility of adulteration or substitution; (4) Plaintiff's second sample was witnessed and provided within two hours of the first sample; (5) Plaintiff's second sample tested positive; and (6) Plaintiff's first sample tested negative.

Cinergy's treatment of the two "similarly situated" employees does not give rise to any inference of pretext. Both Employee #1 and Employee #2 offered explanations of the events giving rise to their challenged conduct. Employee #1 vociferously argued that no one told her she couldn't wait in her

truck, and that no signs were posted in the test facility warning her about leaving the building. Employee #1 also had six prior random drug tests, all of which were negative; after the incident in question she underwent six subsequent unannounced tests, all of which were also negative. There was no allegation that she submitted an adulterated or substituted sample.

Employee #2, when confronted with his second positive test result, frankly admitted he illegally obtained a prescription drug from a co-employee. It is not clear if Employee #2 was under a physician's care at the time, or if he perhaps had his own prescription for medication, but Cinergy concluded that he had "innocent intentions." (Suppl. Burck Affidavit, Exhibit F, p. 7; Doc. 49, Attachment B) The fact that Cinergy subjectively evaluates an employee's explanation of his or her conduct does not amount to a pretext for discriminatory treatment. Plaintiff was also given the opportunity to explain the circumstances surrounding his drug testing. His only explanation contradicted his signature on the Bethesda collection form, attesting that the first sample was his and had been properly collected.

Cinergy also provided evidence that two Caucasian employees who submitted adulterated urine samples were discharged. In the first incident, in 1996, the lab detected an adulterated sample, and the employee was discharged. This employee then argued that Cinergy's disciplinary policy about the consequences of "refusal to test" was unclear. (See, e.g., Substance Abuse Prevention Plan, Document CG&E000162, "An employee will also be deemed to

-18-

have failed a drug test if he/she refuses to submit to any of the required tests ..."; Burck Affidavit, Doc. 36, Attachment B) This employee's grievance led to Cinergy's October 1998 letter to all employees, which states: "It is important for employees to understand that engaging in conduct that clearly obstructs the testing process, for either drug or alcohol testing, is considered a refusal to submit to a physical examination for diagnostic testing, and will subject them to immediate discharge."  This policy was reiterated during an employee seminar and in the handout for that seminar, which Plaintiff attended on June 8, 2000.  (Fritsch Affidavit, ¶5-8; Doc. 36, Attachment D)

   A second Caucasian employee was discharged in June 2000 for submitting an adulterated urine sample, after a masking agent was detected in his sample.

   Cinergy's decision to terminate Plaintiff was as "reasonably informed" as it could be given the "particularized facts" known at the time.  Plaintiff has not proffered any facts that suggest that Cinergy lacked an "honest belief" that Plaintiff submitted a substitute sample on July 26, 2000.

   Plaintiff next contends, under the second prong of Dews, that Cinergy's "real motive" for terminating him was because of his then-pending workers compensation claim.  The Magistrate Judge found that Plaintiff had not established any causal connection between his termination and his workers compensation claim.  The only "evidence" proffered by Plaintiff to demonstrate

-19-

a causal connection is his own unsupported allegation that he was "singled out" for the drug test on July 26, 2000. Plaintiff's allegation, standing alone, is insufficient to raise a genuine issue of material fact on this issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-249 (1986).

The Court finds that Plaintiff has failed to raise a genuine issue of material fact concerning his claim that Cinergy discriminated against him when it terminated his employment. Cinergy's motion for summary judgment on Plaintiff's federal and state discrimination claims should be granted.

## CONCLUSION

Plaintiff's objections to Magistrate Judge Perelman's Report and Recommendation are overruled. Defendant's motion for summary judgment is hereby GRANTED. This case is closed.


DATED: August 2, 2004            s/Sandra S. Beckwith
                                 Sandra S. Beckwith
                                 United States DistrictJudge